Warren Law Group
519 8th Avenue, 25th Floor
New York, New York 10018

Attorneys for PreHired, LLC, et al.,
Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————x

In re Prehired LLC, et al.,[1]                              :

                              Debtors.       :       Case No. 22-11293

                                             :

                                             :       Chapter 11
                                             :

—————————————————————x

**Declaration of Joshua Jordan, Chief Executive Officer**

**of Prehired LLC, in Support of Chapter 11 Petitions and First Day Motions**

============================================================

### I.   <u>Venue</u>

1.      The reason that this bankruptcy is venued in the Southern District of New York is because:

(a) nearly all of the ISAs and contracts apply New York law; (b) many of the ISAs have

litigation explicitly venued in "the United States District Court for the Southern District of

New York and New York State Courts located in New York City;" (c) there is a retainer

deposited with a law firm in New York in a New York bank account; and (d) the law firm

in New York has substantial experience, and institutional knowledge in all matters,

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification numbers, are: Prehired LLC (0436) with a principal place of business in Delaware; Prehired Accelerator (7910) with a principal place of business in Florida; Prehired Recruiting (4322) with a principal place of business in Delaware. The Debtors' service address in these Chapter 11 matters is Prehired, LLC c/o Warren Law Group, 519 8th Avenue, 25th Floor, New York, New York 10018.

litigations, and investigations related to Prehired LLC, and therefore, new counsel would be highly prejudicial to Prehired, LLC.

2.  More importantly, this is an action with national aspects. Prehired LLC creditors are dispersed across the country in at least thirty-eight states. Additionally, Prehired is the focus of investigations by Attorneys General in at least sixteen states, including Delaware and South Carolina. Given the numerous AG investigations involving customers across the country, it is administratively efficient for the bankruptcy to be litigated in New York. Furthermore, my lawyers are located in New York City, and the Southern District Bankruptcy Court is ideally positioned to handle a commercial case of this complexity and magnitude. None of my creditors would be prejudiced from having this bankruptcy venued in New York.

3.  <u>In re Inversora Eléctrica de Buenos Aires S.A.</u>, this Court has found that when a Debtor has assets in a New York bank account, attorneys in New York, a New York forum selection clause, and New York law governed debt, that these factors "considered alone or together, [] provide a sufficient basis for jurisdiction and venue in New York." <u>In re Inversora Eléctrica de Buenos Aires S.A.</u>, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016); <u>See also In re Berau</u>, 540 B.R. at 82-83<u>; In re Octaviar</u>, 511 B.R. at 369-74.

4.  Here, the Debtor has all of these factors: (a) dollar deposits in a New York bank account, (b) an attorney retainer also on deposit in New York, and (c) New York law-governed debt and contracts that, (d) contain a New York forum selection clause; and (e) applies New York law. Based upon the law of the State of New York, and the prior decisions of this Court,these factors provide a sufficient basis for jurisdiction and venue in the United States Bankruptcy Court for the Southern District of New York.

## II. <u>Origins of Prehired</u>

### A.    <u>Prehired Membership</u>

5.    Joshua Jordan developed Science Based Sales®, a deliberate step-by-step program to train Prehired members in software sales.

6.    This program was developed, in part, through industry research and interviews with dozens of software sales managers. Prehired developed its program to meet and exceed these sales managers' requirements to help sell their software products effectively.

7.    Prehired members received training assignments, one-on-one mentoring, and coaching to prepare them to perform as skilled software sales representatives.

8.    As part of their membership, members were paired with a Prehired mentor to receive assistance with job applications, interviews, and salary negotiations in a software sales career after completing the program.

9.    The Prehired mentor assigned to a member helped maximize the member's chances of completing Prehired's program and obtaining a bona fide job (minimum total compensation of $60k, $40k from base salary) after completion of the program.

10.    During the COVID Pandemic beginning in March 2020, Prehired actively worked with its members to help them obtain jobs despite the challenging labor environment created by government shutdowns. Prehired added training and mentoring on how to successfully interview, get hired, and perform a software sales job while being entirely remote/virtual.

11.    In January 2021, due to the increased enrollment in Prehired's programs of members who were out of work due to government shutdowns, Prehired made significant course updates, which included but were not limited to:

a)      The psychology of sales managers and prospects.

b)      Several updated walkthrough videos on specific tools, like LeadIQ and Outplay.

c)      More insights and instructions for preparing personalized brand videos to promote a member's value to hiring managers.

d)      A detailed framework for sales e-mails with "do's" and "don'ts," sample e-mail walkthroughs, and compelling subject lines.

e)      Cold call scripts, breakdowns, objection handling, and sample cold calls.

f)      How to reject a job offer politely.

12.    In March 2021, Prehired started a new program called "Prehired Promoted" to assist employed Prehired members increase their chances of promotion. This program is included in Prehired's lifetime membership at no extra cost to members. In April 2022, based upon feedback from members and after several months of work, Prehired's next major course update went "live." It involved modifying each module so that members received hands-on practice, and members were not permitted to complete Prehired's program until their work met Prehired's standards.

13.    According to Hubspot and CareerKarma (two well-known and respected companies involved in marketing and sales (Hubspot) and career advice (Career Karma)), Prehired's program is not simply successful; it is "Award-Winning."

14.    Prehired is the only tech sales career launch program to be on Hubspot's top sales training programs list three years in a row. Prehired is also Career Karma's "Top Tech Sales Bootcamp."

### B.    The Success of Prehired's Members

15.    Prehired has amassed over 900 positive testimonials about its services, and approximately 500 have been posted on Prehired's website.[2] Notably, there are no requirements in Prehired's Membership Agreement for members to post a positive review; the only "reward" for posting a positive review was a Prehired t-shirt. Prehired encourages its members to provide any negative feedback or suggestions for improvement directly to Prehired so that the company can address these concerns, which it does if these concerns have merit.

16.    Many of the heartfelt and positive testimonials by Prehired members have a similarly positive message, which includes, but is not limited to:

>    a)    Prehired has changed their lives for the better;

>    b)    Prehired has provided tremendous value to the member;

>    c)    Prehired made members' dreams come true;

>    d)    Prehired has a supportive and active community;

>    e)    Prehired mentorship is consistent and effective;

>    f)    Prehired has provided its members with opportunities to increase their income and support their families.

### C.    Prehired's Use of Income Share Agreements ("ISAs")

17.    During Prehired's startup phase, Prehired had to turn away hundreds of potential members who did not have the savings or income to pay Prehired's training costs, nor did these potential members qualify for a third-party loan.

---

[2] https://www.prehired.io/reviews has hundreds of reviews published on its website. (Last visited September 26, 2022).

18.    For Prehired to help these potential members pay for Prehired's program, ISAs were first offered in or around May 2019.

19.    Mr. Jordan was introduced to ISAs by Meratas, Inc, and Leif Technologies, Inc. (two large and well-funded national ISA service providers).

20.    ISAs were a nascent financial instrument that, in sum and substance, allowed a member to delay making payments until after the member: (1) completed Prehired's program; and (2) obtained a job with a certain income threshold.[3]

21.    In other words, unlike other financing options, ISAs shifted some of the risks away from the member since Prehired would not get paid until the member obtained meaningful employment according to the terms of the ISAs.

22.    In fact, under certain circumstances, a member may *never* have to pay for Prehired's services, even after obtaining meaningful employment.

23.    Prehired sold most of the ISAs entered into with its members to ISA funding companies such as SELF/ISA Plus and Blair (two ISA funders/providers). These ISA funders had exclusive control over the drafting of the terms and conditions of the ISAs, including the development of any purported underwriting standards.

24.    At no time was Prehired responsible for drafting the language and terms contained in the ISAs.

---

[3] ISAs are currently unregulated by the Federal  government. Senate Bill 4551, titled the "ISA Student Protect Act of 2022," is currently pending in the Senate and has been co-sponsored by Sen. Coons (DE), as well as Sen. Warner (VA), Sen. Rubio (FL), and Sen Young (IN).

### III. Prehired and Joshua Jordan's Relationship with Darius Goldman

#### A.    Prehired and Meratas

25.    Darius Goldman is the CEO of Meratas, the primary service provider and originator of Prehired's ISAs, and he has also been legal counsel for Prehired.

26.    During most of its existence, Prehired and Mr. Jordan relied on the legal advice of Mr. Goldman for everything from contracts, Membership Service Agreements (MSAs), Income Share Agreements (ISAs), Settlement Payment Plans (SPP), and operational and corporate governance.

27.    During the relationship between Prehired and Meratas, a company Mr. Goldman owns called Inprosper, LLC purchased approximately 100 ISAs (that had a potential value of $30,000.00 each) for $10,000.00 each – or a total of $1,000,000.00, from Prehired.

28.    After the deal was entered into, Mr. Goldman contacted Mr. Jordan and offered to renegotiate the agreement. Specifically, Mr. Goldman requested that the $1,000,000.00 be treated as a direct investment of Inprosper into Prehired, as opposed to a purchase of ISAs.

29.    In addition, Mr. Goldman touted his legal expertise and knowledge (he was previously a corporate partner at the prestigious international law firm of Katten Muchin Rosenman LLP and worked on ISAs while there) as being beneficial to Prehired. Given Mr. Goldman's representations, Mr. Jordan agreed, and Mr. Goldman returned the 100 ISAs.

30.    Mr. Goldman and Mr. Jordan further agreed that, in exchange for Prehired keeping the $1,000,000.00 initially intended for the purchase of the 100 ISAs, Mr. Goldman would provide: (a) legal advice/counseling and the legal framework to create and grow an ISA program; and (b) Mr. Goldman would enter into a – " Simple Agreement for Future Equity" (also known as a "SAFE") whereby Mr. Goldman would obtain a 10% interest in Prehired's

equity after Prehired was sold or raised a certain amount of equity funding. Mr. Goldman also included an addendum to the SAFE – unexplained to Mr. Jordan – that superseded the SAFE terms and provided that Mr. Goldman would receive a 50% return on the $1,000,000.00 every year until the principal amount of $1,000,000.00 was paid in full.

31.    Over a period of two years, Mr. Jordan made payments pursuant to the addendum included in the SAFE, which totaled $750,000.00.

32.    In September 2021, Mr. Goldman agreed to "re-do" the SAFE deal (after pleas from Mr. Jordan that the agreement was unfair) wherein: (a) Prehired would owe Inprosper $250,000.00 (i.e., the remaining amount due on the $1,000,000.00); (b) Inprosper would obtain a warrant that would allow it to obtain a 5% equity interest in Prehired; and (c) Mr. Goldman would continue to provide legal and regulatory advice to Prehired, knowing that he was going to be a future owner of the company.

33.    On September 20, 2021, Inprosper and Prehired entered into a Warrant Agreement whereby, in recognition of his skills and experience desirable to Prehired, Mr. Goldman agreed to provide certain consulting services to Prehired (i.e., primarily legal and regulatory advice and counsel). In exchange, the Warrant Agreement recognizes that Inprosper (Mr. Goldman's company) would have the right to purchase units representing 5% of Prehired's fully diluted membership interest. In addition, a promissory note for $250,000.00 was signed by Prehired to the benefit of Inprosper (i.e., Mr. Goldman) in exchange for the value of legal and consulting services that Mr. Goldman had provided *and would continue to provide*.

34.    During the majority of its existence, Prehired and Mr. Jordan relied on the legal advice of Mr. Goldman for everything from contracts and settlement agreements to operational and corporate governance.

35.    The operating documents of Prehired, including but not limited to Membership  Service Agreements (MSAs), Income Share Agreements (ISAs), Settlement Payment Plans (SPP), as well as substantial subsequent revisions to those documents, were all drafted by Mr. Goldman in his capacity as counsel.

36.    In addition, Mr. Goldman reviewed every ISA funding/purchasing contract entered into by Prehired. Mr. Goldman was the only attorney reviewing contracts and providing comments and revisions crucial in negotiating successful business deals. Mr. Goldman was the only attorney reviewing these complicated contracts.

37.    Mr. Goldman also went as far as representing himself as the co-owner, co-founder, and advisor to Prehired to many financial institutions and often negotiated with other entities on Prehired's behalf.

38.    Notably, from December 2021 into early 2022, when Prehired had approximately 300 ISA agreements in default, Mr. Jordan requested guidance from Mr. Goldman regarding filing lawsuits to collect on these defaulted ISA contracts.

39.    Mr. Goldman contacted an attorney specializing in membership training and networking organizations to inquire whether filing in the Delaware Justice of the Peace Court could be a viable route to seek to collect on the defaulted ISA contracts. The attorney responded to Mr. Goldman and provided a tentative opinion indicating that the attorney did not believe it was likely a viable option.

40.   Notwithstanding, Mr. Goldman forwarded the communications between himself and this
      attorney to Mr. Jordan and, despite the attorney's uncertain opinion, prodded Mr. Jordan
      into filing the lawsuits in Delaware.

41.   Importantly, Mr. Goldman never dissuaded Mr. Jordan from filing the actions in the
      Delaware Justice of the Peace Court.

42.   Prehired had never enforced any of the defaulted ISAs previously and followed Mr.
      Goldman's advice on how to proceed.

**B.    Creation of Prehired Recruiting, LLC**

43.   Based upon Mr. Goldman's counsel, Prehired Recruiting, LLC, was formed in Delaware
      on December 30, 2021, and Prehired, LLC, which had been a South Carolina registered
      LLC since July 2017, was converted into a Delaware LLC on December 29, 2021.

44.   Prehired Recruiting, LLC, which in the past had provided software sales recruiting services
      for other companies in the industry, was also tasked with collecting defaulted ISA contracts
      on behalf of Prehired LLC.

45.   Mr. Jordan researched the issue of filing the actions in the Delaware Justice of the Peace
      Court and learned about the State of Delaware's Supreme Court Rule 57 and Justice of the
      Peace Court Form 50, which allow individuals to represent corporate entities in Justice of
      the Peace Court legal proceedings.

46.   Mr. Jordan forwarded Delaware's Supreme Court Rule 57 and Justice of the Peace Court
      Form 50 to Mr. Goldman.

47.   In response, Mr. Goldman advised Mr. Jordan that  Rule 57  would allow an officer of
      Prehired to represent the company in the Justice of the Peace Court and that according to

the Rule, Mr. Jordan could appear as a corporate representative on behalf of Prehired Recruiting, LLC.

48. Mr. Goldman advised Mr. Jordan, in writing, that the best approach for Prehired to engage in debt-collection actions in the Delaware Justice of the Peace Court would be for Prehired to become a Delaware LLC.

49. Between January 13, 2022, and February 17, 2022, Prehired filed 289 lawsuits in the Delaware Justice of the Peace Court, operating on the advice of counsel and after having spoken with the staff at the Delaware court regarding the filing of the cases.

### C.    Creation of Prehired Accelerator

50. Prehired Accelerator, LLC, was created in Florida on September 1, 2021, to hold defaulted ISAs and to pursue collection activities on them.

51. Upon information and belief, no debt enforcement actions concerning the ISAs held by Prehired Accelerator have been undertaken.

52. Some ISA contracts held by Prehired Accelerator have been settled between Prehired and its members, and settlement payments have gone directly to Prehired Accelerator and not to Prehired LLC or Prehired Recruiting.

### D.    Former Prehired Member Begins a Campaign to Attack Prehired

53. Matthew Provins completed Prehired's program and is a member. Initially, Mr. Provins was delighted with Prehired's program and praised it effusively. However, Mr. Provins later led a social media campaign to attack Prehired and interfere with Prehired's customer base.

54.   Upon information and belief, what Mr. Provins did not disclose to his social media followers was that Mr. Provins was working for a competing company and was using the tactic of attacking Prehired to gain a business advantage.

55.   In or about March 2022, Prehired filed suit against Mr. Provins in the U.S. District Court for the Eastern District of California, alleging business defamation and tortious interference with third-party contractual relations. Mr. Provins filed an anti-SLAPP motion to dismiss, which Prehired opposed. The motion to dismiss has been pending for several months, with no decision to date.

56.   Mr. Provins' campaign to attack Prehired coincided with Prehired's filing of lawsuits in Delaware to enforce defaulted ISAs.

57.   In furtherance of Mr. Provins's scheme to gain a business advantage, Provins contacted the Delaware Department of Justice to complain about the actions of Prehired, recognizing that an investigation could ensue, which would be damaging to Prehired's business operations.

58.   Mr. Provins previously worked for Prehired and, in that capacity, obtained access to confidential contact information for Prehired customers.

59.   Using the confidential contact information of Prehired's customers, Provins gathered together at least 50 other Prehired members in a private online group on LinkedIn and Slack.

60.   Mr. Provins successfully organized this group of about 50 Prehired members in private online groups on LinkedIn and Slack to actively file complaints with Attorney General's Offices across the country during the same week in February 2022.

61.   Mr. Provins and these 50 individuals did this because Mr. Provins communicated that the investigations could force Prehired into bankruptcy. Moreover, Mr. Provins encouraged

these Prehired members to refrain from making payments on their ISAs and enter into default.

## IV.  The Filing of Cases in Delaware's Justice of the Peace Court

### A.    Intention to File

62.    From December 28, 2021, to January 20, 2022, Mr. Jordan researched the Delaware Justice of the Peace Court rules and made more than half a dozen phone calls to the Court to confirm that Prehired Recruiting was doing everything the proper way; this included the staff of the Justice of the Peace Court confirming that the Court would have jurisdiction over cases involving out-of-state residents as long as Mr. Jordan provided proof of service.

63.    In addition to legal advice from Mr. Goldman, Prehired filed lawsuits in the Delaware Justice of the Peace Court (i.e., small claims court) for two primary reasons: (a) claims for up to $25,000.00 were allowed; and (b) the Justice of the Peace Court offered litigants the ability to conduct proceedings virtually from anywhere in the United States.

64.    Prehired believed that in these lawsuits, it acted in the defaulted members' best interests, as well as Prehired's, because it reduced the amount owed on the ISAs from $30,000.00 to $25,000.00, and the members could participate in the proceedings virtually. The members did not have to hire an attorney because the Delaware Justice of the Peace Court, like other small claims courts, is often used by individuals representing themselves, which is cost-effective for all parties.

65.    Again, before proceeding with the filings, Mr. Jordan contacted the Delaware Justice of the Peace Court staff to confirm specific sections of the court rules and procedures. The staff of the Justice of the Peace Court informed Mr. Jordan that Prehired Recruiting could proceed with the lawsuits because Prehired Recruiting was a Delaware entity.

66.   In addition, Mr. Jordan completed an application in accordance with Delaware Supreme Court Rule 57 and Justice of the Peace Court Form 50, which allows a non-attorney to represent a corporate entity; this procedure allowed him to represent Prehired Recruiting in the lawsuits that would be filed in Delaware.

67.   Prehired spent $15,081.25 in filing fees for the 289 lawsuits; these fees do not include almost $10,000 for the other costs and expenses to file the 289 lawsuits.

68.   Of the 289 lawsuits, service was effectuated on approximately 130 defaulted Prehired members.

69.   Of those served members, only eight appeared through counsel or otherwise. Six of the eight members represented by counsel were part of the original 50+ private group organized by Mr. Provins, and they shared the same counsel.

### B.   The Delaware Department of Justice's Consumer Protection Unit

70.   On March 8, 2022, the Delaware Consumer Protection Unit ("Delaware CPU") sent a non-public letter to Chief Magistrate Judge Alan Davis of the Delaware Justice of the Peace Court that: (a) requested that the Court revoke Mr. Jordan's Rule 57 status because – although properly obtained by Mr. Jordan – this status was a privilege that the Court could revoke at its discretion, and (b) noted that it was investigating whether Mr. Jordan had violated Delaware's Consumer Protection Act.

71.   On April 1, 2022, Prehired agreed to voluntarily dismiss the lawsuits filed in the Delaware Justice of the Peace Court, believing it could pursue the outstanding debts through arbitrations and state court proceedings across the country.

72.   On April 5, 2022, the Delaware CPU demanded to know Prehired's position concerning the propriety of filing actions in the arbitration forum maintained by Ejudicate, Inc., and

whether filing and prosecuting these claims was proper, given that Ejudicate was not mentioned in the ISAs' terms and conditions.

73. On April 8, 2022, Prehired responded and explained its position, noting that Prehired was not involved in the drafting of the ISAs and, consequently, had to update the "Terms of Service" on Prehired's website to amend the existing arbitration clause in the ISA to include the Ejudicate platform.

74. Upon information and belief, Ejudicate offered members a faster and less expensive arbitration forum than its competitors.

75. On May 18, 2022, the Delaware CPU disagreed that Prehired could update its Terms of Service to amend the ISAs and include Ejudicate as an arbitration platform. Notably, the Delaware CPU alleged that Ejudicate followed Constitutionally questionable procedures and that Prehired members could not be compelled to arbitrate on the Ejudicate platform via an update to the Terms of Service.

76. The Delaware CPU warned that if Prehired attempted to arbitrate claims via Ejudicate, the State of Delaware would be compelled to file an injunction to seek to stop the arbitrations.

77. Given the Delaware CPU's position, Prehired did not pursue arbitrations via Ejudicate.

78. Prehired tried to ascertain whether it could enforce the defaulted agreements in the counties across the country where the defaulted members resided.

79. While Prehired continued investigating the possibility of pursuing hundreds of defaulted contracts, the Delaware CPU shifted its position. The Delaware CPU intimated that Prehired may have engaged in violations of the Delaware Consumer Protection Act given its program representations and that Prehired had to cease collection efforts on *all* defaulted ISAs, irrespective of when and where the ISA was executed.

80. Specifically, the Delaware CPU contended that payments from ISAs were coming into Delaware. Delaware claimed that, as a result, it had national jurisdiction over Prehired's operations, given that it was a Delaware-based corporation. In other words, the Delaware CPU updated its position to argue that any arbitrations or litigations by Prehired to collect on the debts would be met with a request from the CPU for injunctive relief to stop these actions.

81. The Delaware CPU, in sum, has taken the position that all of Prehired's ISAs are void irrespective of differences in state law treatment of ISAs and has threatened to file an injunction against Prehired if it ever tries to enforce debt collections on ISAs.

82. Moreover, the Delaware CPU required Prehired to stop all of its new enrollments since it believed that all ISAs issued by Prehired were unenforceable, particularly given purported consumer protection issues revolving around Prehired's representations to consumers.

83. During the course of the Delaware CPU's investigation, Prehired engaged different law firms experienced in this area of the law to update its business operations in order to restart its program and enroll new members using a different business model, including moving away from ISAs until further regulatory clarity is promulgated for this financing option.

84. Since April 2022, the Delaware CPU has issued approximately five subpoenas to Prehired.

### V.  Other Attorney General Investigations, Actions, and Civil Litigation

### A.    Reid v. Prehired

85. On April 15, 2022, a putative class action for Washington state residents who are Prehired members was filed in the U.S. District Court for the Eastern District of Washington concerning purported violations of Washington state private vocational school licensing

laws, as well as Washington state consumer protection laws. See Reid v. Prehired, 2:22-cv-00072 (TOR) (E.D. Wash.).

86.     The Complaint in Reid referenced the non-public letter dated March 8, 2022, sent by the Delaware CPU to Chief Magistrate  Davis of the Delaware Justice of the Peace Court, which evidences that the Delaware CPU  shared information concerning its investigation of Prehired with Prehired members.

87.     In addition, the Delaware CPU notified other state attorney generals and financial regulatory offices of its investigation of Prehired's operations and, upon information and belief, also discussed with these attorney generals and offices the possibility of them initiating their own investigations of Prehired.

### B.     California Subpoena

88.     On May 24, 2022, the Department of Financial Protection and Innovation of California issued a subpoena to Prehired.

89.     Prehired responded to the subpoena on June 30, 2022, and also responded to outstanding requests on July 29, 2022, and August 15, 2022.

### C.     Washington Civil Investigative Demands

90.     On May 25, 2022, the Consumer Protection Division of the Washington Attorney General's Office ("Washington CPD") issued a Civil Investigative Demand ("CID") to Prehired.

91.     Prehired was unable to respond to the CID given that – despite a request for an extension of time to respond – the Washington CPD opted to quickly file a lawsuit on June 8, 2022.

### D.    __Iowa Subpoena__

92.    On June 8, 2022, the Consumer Protection Division of the Iowa Attorney General's Office issued a subpoena to Prehired.

93.    Prehired responded to the subpoena on June 28, 2022, and provided additional responses to outstanding requests on August 5, 2022.

### E.    __Illinois Subpoena__

94.    On June 22, 2022, the  Attorney General's Office of Illinois issued a subpoena to Prehired.

95.    On August 11, 2022, Prehired responded to the subpoena, although several document request responses remain outstanding.

### F.    __ISA Plus Lawsuit__

96.    On July 1, 2022, ISA Plus, LLC, filed a lawsuit in California state court against Prehired, LLC and Mr. Jordan, alleging breach of contract and over $2,500,00.00 in damages.

97.    On August 18, 2022, Prehired removed the case to the U.S. District Court for the Southern District of California.

98.    Prehired answered the Complaint, and the case is scheduled for a  neutral evaluation with the magistrate judge to explore any settlement potential.

### G.    __Massachusetts CID__

99.    On July 28, 2022, the Attorney General's Office of Massachusetts issued a CID to Prehired.

100.    On September 9, 2022, Prehired responded to the CID, although several responses remain outstanding.

**H.**    **Putative Prehired Class Action**

101.    On or around July 28, 2022, Prehired was served with a putative class-action lawsuit in

Nghia "Nathan" Nguyen v. Prehired, 22-CV-2894 (N.D. Ga.).

102.    On August 18, 2022, Prehired submitted a motion to compel arbitration, and the parties are

still in the midst of motion practice litigating this issue.

**I.**    **Wisconsin Subpoena**

103.    On August 3, 2022, the Public Protection Unit of the State of Wisconsin's Department of

Justice issued a subpoena to Prehired.

104.    On September 16, 2022, Prehired responded to the subpoena, although several of the

responses remain outstanding.

**J.**    **Colorado CID**

105.    On August 8, 2022, the Attorney General's Office of Colorado issued a CID to Prehired.

106.    Prehired has not responded to the CID  yet.

**K.**    **Pennsylvania Subpoena**

107.    On August 11, 2022, the Attorney General's Office of Pennsylvania issued a subpoena to

Prehired.

108.    On September 21, 2022, Prehired responded to the subpoena, although several responses

remain outstanding.

**L.**    **Virginia CID**

109.    On August 12, 2022, the Attorney General's Office of Virginia issued a subpoena to

Prehired.

110.    Prehired anticipates filing a response to the Virginia CID during the week of September

26, 2022.

**M.      Multi-State Meeting**

111.    As a result of the multiple state investigative office subpoenas and CIDs, on August 17,

2022, a call was engaged in between counsel for Prehired and representatives of the states

of Arkansas, Colorado, Delaware, Illinois, Indiana, Iowa, Ohio, Massachusetts, Minnesota,

North Carolina, New York, Pennsylvania, Virginia, Washington, Wisconsin, and

California, of which nearly all have issued CIDs or subpoenas to Prehired and its related

entities.

112.    Prehired requested that the various offices consolidate their requests into one CID, given

Prehired's limited resources and how unduly burdensome it has become to respond to so

many CIDs under similar timelines. The Delaware CPU responded on behalf of the states

and indicated that they could not issue one CID, given that the states are independent

sovereigns whose subpoena and CID powers are governed by different, state-specific

statutes.

**N.      South Carolina CID**

113.    On September 23, 2022, the Attorney General's Office of South Carolina informed

Prehired that it intended to issue a CID, and the CID was served on September 26, 2022.

**O.      Blair lawsuit filed by Prehired**

114.    In August 2022, Prehired filed suit against New Epona Inc. d/b/a Blair ("Blair") for breach

of contract. See Prehired v. Blair, CGC-22-600833 (Superior Court of California, County

of San Francisco).

115.   Prehired claims that Blair purchased ISAs from Prehired but failed to pay for them, which represents a clear breach of the contract between the parties. Blair filed a motion alleging that California, in which Blair has its headquarters and is authorized to do business, is forum non conveniens. That motion is pending.

## VI. Investigations Severely Affected Prehired's Business Model

116.   Before the Delaware CPU investigation began, Prehired had sixteen staff members.

117.   Given the Delaware CPU's position stopping Prehired from collecting on defaulted debts and precluding Prehired from enrolling new members, Prehired has had to terminate 14 staff members. Accordingly, only two (2) staff members remain working full-time, and one individual is assisting in answering inquiries arising from the investigations on an unpaid basis.

118.   Prehired's new membership enrollments dropped from around 30 each month to less than ten each month, and presently zero, given the Delaware CPU's position.

119.   Prehired's inability to pursue debt collection actions against defaulted customers has prevented Prehired from obtaining additional income streams needed to operate, including maintaining and increasing staff.

120.   The Delaware CPU's actions, and its position concerning ISAs, has resulted in Prehired having to file for bankruptcy protection despite the fact that Prehired's program has changed the lives of hundreds of its members for the better.

121.   Prehired estimates that if one compares the members' reported income in aggregate before they joined Prehired with the members' reported income in aggregate after having completed Prehired's program, an additional $30,000,000.00 in income is generated every

year by these members because they joined Prehired,  and this amount will continue to grow each year as their careers blossom.

122.  Prehired rejects any notion that its program is fraudulent and misled consumers. Indeed, even before Prehired knew of the investigations against it, Prehired had released hundreds of members from having to pay their ISA commitments in response to their adverse personal circumstances; this decision not to enforce the ISA payments resulted in Prehired forgoing approximately $12,000,000.00 in income that it otherwise would have been entitled to.

123.  Prehired rejects the notion that it "pushed" people out of its program and prevented them from completing it. It was and is a member's choice whether to voluntarily abandon or withdraw from Prehired's training program and membership. In fact, Prehired's position is that it always took steps to proactively help members who – because of their life circumstances – were having issues complying with the program's requirements.

## VII.      Prehired's Newly Adopted Business Model

124.  During and due to the Delaware CPU's investigation, Prehired engaged several law firms to update its business operations, restart its program, and begin enrolling new members using a different business model, contracts, and financing. The new program was put in place as of September 27, 2022.

125.  Due to the Federal government having failed to provide any regulatory clarity with respect to ISAs in the marketplace, Prehired will be utilizing another method of financing until regulatory clarity is available regarding ISAs as a financing option.

## VIII.    <u>Prehired As A Going Concern</u>

126.    As of the date of this filing, Prehired has advised the Delaware CPU that it has restarted its lawful operations and anticipates enrolling new customers using new agreements, new contracts, and a new financing model.

127.    As of the date of this filing, Prehired is taking steps to begin enforcing the terms and conditions of the defaulted ISAs in the members' respective state courts.

128.    However, despite Prehired now continuing its operations, due to the investigations by various state investigative offices and civil litigation initiated, in part, apparently as a result of the Delaware CPU sharing certain information with Prehired members, Prehired has been required to file for Chapter 11 bankruptcy protection because it is insolvent.

129.    Here the cost of filing for Chapter 11 bankruptcy is justified by the benefit, which is keeping Prehired as a going concern and providing a means for people to earn a livelihood they otherwise would not have.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated: September 28, 2022                              _/s/ Joshua Jordan_____

                                                                      Joshua Jordan
                                                                      Chief Executive Officer
                                                                      Prehired, LLC
                                                                      Prehired Recruiting, LLC
                                                                      Prehired Accelerator, LLC